Rudy T. OEI and M.J.F.M. Kools, d/b/a Kools de Visser, Plaintiffs,

v.

CITIBANK, N.A. and Citibank International, Defendants.

No. 96 Civ. 3737 (MBM).

United States District Court, S.D. New York.

March 20, 1997.

494

Dorothea W. Regal, Claire Costello, Kathleen L. Lowden, Hoguet Newman & Regal, New York City, for Plaintiffs.

Joel David Sharrow, Michael Evan Avidon, Mitchell D. Bernstein, Moses & Singer, New York City, for Defendants.

MUKASEY, District Judge.

Plaintiffs, Rudy Oei and M.J.F.M. Kools, the sole proprietor of Kools de Visser, sue Citibank N.A. ("Citibank") and Citibank International ("Citibank Int'l"), for fraud and aiding and abetting fraud, and Citibank for wrongful honor and conversion, arising out of payment on a letter of credit issued by Citibank at Oei's direction as part of a transaction in which plaintiffs sought to purchase Levi jeans. Defendants move to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), or in the alternative, for a summary judgment, dismissing all claims, and striking plaintiffs' demands for consequential and punitive damages and for a jury trial. Defendants move

also to dismiss the fraud and aiding and abetting fraud claims pursuant to Fed. R.Civ.P. 9(b). Plaintiffs cross-move for summary judgment on the wrongful honor claim. For the reasons given below, defendants' motion to dismiss, or in the alternative for summary judgment, is granted as to plaintiffs' conversion claim and the fraud and aiding and abetting claims against Citibank, but denied as to the other claims. Defendants' motion to strike plaintiffs' demand for punitive damages on the fraud claim is denied, but their motions to strike plaintiffs' demands for consequential and punitive damages on the wrongful honor claim and for a jury trial are granted. Defendants' motion to dismiss pursuant to Rule 9(b) is denied. Plaintiffs' cross-motion for summary judgment on the wrongful honor claim is granted.

## I.

On January 5, 1995, I dismissed an action brought by M.J.F.M. Kools against Citibank, because Kools, as an undisclosed principal, lacked standing to sue for wrongful honor of a letter of credit issued by Citibank at Oei's application, allegedly as agent for Kools. *Kools v. Citibank*, 872 F.Supp. 67 (S.D.N.Y. 1995), *certifying question to New York Court of Appeals*, 73 F.3d 5 (2d Cir.1995), *opinion withdrawn*, No. 95–7209, 1996 WL 450776 (2d Cir. Aug.5, 1996). Kools appealed, but then withdrew that appeal and filed this action together with Oei.

Familiarity with my previous opinion is assumed. The following facts are drawn from the complaint, and the parties' affidavits, exhibits and Rule 3(g) statements: Oei is a resident of Connecticut and a retired IBM product manager. (Compl. ¶ 1; Oei 9/9/96 Aff. ¶ 2) Kools de Visser ("Kools") is a Netherlands sole proprietorship with its principal place of business in Bergen Op Zoom, the Netherlands, and is owned by M.J.F.M. Kools and managed by Wilhelmus Kools: (Compl. ¶ 2; M.J.F.M. Kools 9/9/96 Aff. ¶ 3) Kools sells clothing at wholesale and retail in the Netherlands. (Compl. ¶ 2) In 1992, Kools retained Oei as a broker to purchase

on its behalf Levi jeans made in the United States. (Compl. ¶ 8; Pl. 3(g) ¶ 1) Oei arranged a transaction with Jade–USA, Inc., which purported to be a supplier of such jeans and which agreed to supply 43,200 pairs of Levi jeans at $23.25 a pair, for a total cost of $1,004,400. (W. Kools 9/9/96 Aff. ¶ 12)

To effect this transaction, Oei applied for a letter of credit from Citibank. (Pl. 3(g) ¶ 2; Def. 3(g) ¶ 1) The Application and Agreement for Commercial Letter of Credit ("Application Agreement"), dated October 28, 1992, provided that Citibank would issue a letter of credit in the amount of $1,004,400, with Jade designated as beneficiary, for the purchase of "LEVI JEANS 501–0191, New, Originals, Made in USA." (Compl. ¶ 9 & Ex. A; Pl. 3(g) ¶ 2) The Application Agreement provided that it was to be governed by the Uniform Customs and Practice ("U.C.P.") for Documentary Credits as most recently published by the International Chamber of Commerce, *i.e.*, the 1983 version of the U.C.P. [hereinafter "U.C.P. 400"], and by the laws of the state of New York, except to the extent that such laws are inconsistent with the U.C.P. (Compl., Ex. A ¶ 17) On October 20, 1992, Kools transferred $1,080,000 into Oei's and his wife's joint checking account at Citibank. (Def. 3(g) ¶ 11) Then, on October 30, 1992, Oei deposited $1,004,400 (plus certain letter of credit fees for Citibank totalling approximately $8,000) from this account into a Citibank savings account in his name, in Totten trust for his wife, to secure Citibank's payments under the letter of credit. (Def. 3(g) ¶ 12; Compl. ¶ 11)

On October 30, 1992, Citibank actually issued the Letter of Credit, with Citibank International ("Citibank Int'l"), a Citibank affiliate located in Miami, acting as advising bank.[1] (Compl. ¶ 4 & Ex. A) Citibank Int'l functioned as advising bank for the amendments to the letter of credit and also collected the documents from the beneficiary for shipment to the issuer, Citibank, although its other roles in the transaction are disputed.

---

1. An advising bank is a "bank that is usually a correspondent of the issuing bank and that notifies the beneficiary that the credit has been issued or has been amended." John F. Dolan, *The Law of Letters of Credit*, Glossary of Letter of Credit Terms (rev. ed. 1996).

The letter of credit, as amended on November 2 and 4, 1992, required that to redeem the funds, Jade was to submit specified documents to Citibank conforming to certain requirements, including those set forth in the U.C.P. 400. (Compl., Ex. B) These documents included: 1) a sight draft bearing the identifying reference specified in the letter of credit; 2) an original and four copies of Jade–USA's commercial invoice for merchandise described as "LEVI JEANS 501–0191, NEW, ORIGINALS, MADE IN USA LABELS"; 3) an insurance policy or certificate; 4) all originals of a "MARINE/ON BOARD OCEAN BILL OF LADING OR CONTAINER BILL OF LADING OR BILL OF LADING BEARING CONTAINER ENDORSEMENT" issued to Kools, to be marked "NOTIFY RUDY T. OEI" and "FREIGHT PAID"; 5) a packing list; and 6) a certificate of compliance of quality and inspection by Lloyds of London. (Compl., Ex. B)

Defendants claim that plaintiffs were aware that Jade would submit false documents. Although the letter of credit required "on board" bills of lading and the goods were to be described as "genuine" Levi jeans, defendants claim that plaintiffs were aware that the beneficiary, Jade, would be paid before the goods were loaded on board a ship (Sharrow 7/10/96 Decl., Exs. 17–18; *Id.,* Ex. 5 at 85), and that the jeans that would be shipped would be counterfeit. Plaintiffs deny both allegations.

On November 18, 1992, Jade presented Citibank Int'l with documents requesting payment under the letter of credit. (Def. 3(g) ¶ 21; Pl. 3(g) ¶ 5) These documents did not conform to the letter of credit requirements. They included a truck bill of lading, rather than a marine bill of lading, issued by Eagle Freight Services, purporting to show shipment by truck from Seattle, Washington, to Rotterdam, the Netherlands. (Pl. 3(g) ¶ 5; Compl., Ex. C) In addition, the bill of lading contained several other discrepancies: it was dated five days later than the date on which Citibank Int'l received it; it failed to identify the goods; and it named Jade, rather than Kools, as consignor. (Compl. ¶¶ 16–17) As a result of these and other discrepancies (Compl., Ex. D), Citibank Int'l notified Jade that it would not accept the documents. (Def. 3(g) ¶ 23) The discrepancy report created by Citibank Int'l employee Luis Castellanos states that Diann Hart, Jade's president, told him to "hold on" to the documents, and that Jade would submit new ones. (Compl. ¶ 19, Ex. D; Def. 3(g) ¶ 24) Plaintiffs claim that Citibank Int'l should have known that the documents were fraudulent, rather than merely discrepant, both because of the above discrepancies and because Jade's request that Citibank Int'l hold the documents was unusual as bills of lading are negotiable and a shipping company would not issue a corrected bill of lading without return of the original. (Compl. ¶ 20; Colleran 9/7/96 Aff. ¶ 33)

On or about November 24, 1992, Jade presented new documents requesting payment under the letter of credit, including a marine bill of lading issued by Sea–Land Services, Inc. (Compl. ¶ 22; Def. 3(g) ¶ 25) Once again, these documents contained discrepancies, and once again, Citibank Int'l's discrepancy report stated that Jade would "fix" the problem and that the bank would hold the documents. (Compl. ¶ 24, Ex. F; Def. 3(g) ¶ 28) Plaintiff alleges ·that Citibank Int'l should have been aware that these documents were fraudulent because it was now in possession of two different bills of lading for the same goods, which showed that two shippers had received the same goods for shipment. In addition, the method of shipment in each bill of lading was different, one by land and one by sea. (Compl. ¶ 25; Pl. 3(g) ¶ 16)

On November 30, 1992, Jade presented a third set of documents requesting payment under the letter of credit for the third time. (Compl. ¶ 27 & Ex. H) Plaintiff alleges that these documents were also discrepant and inconsistent in many ways and were fraudulent on their face. (Compl. ¶ 29) Citibank Int'l forwarded the documents to Citibank without paying Jade, mistakenly omitting the inspection document from the package of documents. (Def. 3(g) ¶¶ 30–31) Plaintiffs, in reliance on testimony given by Hart in a previous action (Compl. ¶ 36; Sharrow 7/10/96 Decl., Ex. 10), claim that Luis Castellanos, the Citibank Int'l employee who checked the documents submitted by Jade,

altered them by typing "Levi JEANS 501 0191 NEW ORLEANS, MADE IN USA LABELS" onto the face of the inspection document. (Compl. ¶ 36) They allege further that some Citibank or Citibank Int'l employee altered the packing list and the original invoice by typing the word "JEANS" onto those documents. (Compl. ¶ 37) To support this allegation, plaintiffs assert that the packing list included in the documents Jade submitted did not include the word "JEANS", but that the packing list honored by Citibank contained the word "JEANS." (Pl. 3(g) ¶¶ 50–51; W. Kools 9/9/96 Decl. ¶ 34, Exs. F, G) Castellanos and Citibank deny these allegations and cite contrary evidence. (Castellanos 7/8/96 Aff. ¶ 3; Sharrow 7/10/96 Decl., Ex. 10 at 122–23; Sharrow 12/4/96 Aff., Ex. 17)

When these documents arrived at Citibank, its Trade Service Representative Rose Williams found several discrepancies which she detailed in a discrepancy report, including that the bills of lading and insurance did not mention "JEANS," the packing list did not name the beneficiary, and the inspection certificate was missing. (Compl., Ex. I; Def. 3(g) ¶ 32) As will be shown below, the documents also contained other discrepancies and inconsistencies that Citibank did not note.

On December 2, 1992, despite these discrepancies, Citibank paid Jade $1,004,400 by crediting Citibank Int'l's account. (Def. 3(g) ¶ 35) Defendants claim that they contacted Oei by telephone on December 2 and that he waived these discrepancies. (Def. 3(g) ¶¶ 33–34) The discrepancy report, compiled by Williams, does indicate that someone named "Carlos" approved payment on December 2, 1992 at approximately noon. (Compl., Ex. I) Iris Carlo, an Assistant Vice President at Citibank's Tarrytown, N.Y. branch, states that she received a call from Williams on December 2, 1992, advising her of several discrepancies in the documents submitted by Jade. (Carlo 7/9/96 Aff. ¶¶ 1–2) Carlo claims she informed Wade Walker, a Citibank Vice President and the "Relationship Manager" assigned to Oei, of these discrepancies. (Carlo 7/9/96 Aff. ¶ 3) Walker states that he called Oei and told him that the bills of lading omitted the word "Jeans," that the

packing list left out the beneficiary's name, and that the original inspection certificate was missing. Walker claims that Oei approved payment despite these deficiencies. (Walker 10/28/96 Aff. ¶ 22) Walker claims that he told Carlo that "payment approval had been received." (Walker 7/3/96 Aff. ¶ 3) Carlo states that she then telephoned Williams stating "that approval to pay had been received." (Carlo 7/9/96 Aff. ¶ 3) Williams confirms that she received this call at 12:10 p.m. on December 2 and then authorized payment to Jade. (Williams 7/2/96 Aff. ¶ 4)

Plaintiffs claim that Walker did not inform Oei during their telephone conversation on December 2 of any discrepancies in the documents other than that the original inspection certificate was missing; Oei states that he approved payment based upon a copy of the inspection certificate. (Pl. 3(g) ¶¶ 30–33; Def. Response to Pl. 3(g) ¶ 15)

Immediately after paying Jade, Citibank debited Oei's account by $1,004,400. (Def. 3(g) ¶ 36; Pl. 3(g) ¶ 28) The same day, Oei picked up the documents from Citibank's office. (Pl. 3(g) ¶ 35; Def. 3(g) ¶¶ 37–38) Citibank attached to the documents a "payment advice", which stated that "[w]e believe the attached documents to be in due form and regular in every respect. However, we assume no responsibility for the genuineness of the documents or for the quality or quantity of the merchandise represented thereby." (Compl., Ex. J)

It is undisputed that Citibank never informed plaintiffs of the first two presentments, although it remains disputed whether Citibank Int'l ever informed Citibank of these presentments, or whether Citibank, even if it was not told of them, should be charged with such knowledge as a result of its relationship with Citibank Int'l. (Williams 1/4/96 Aff. ¶ 2 n. 3; Castellanos 10/21/96 Aff. ¶ 7)

On December 2, 1992, Oei recognized some discrepancies and inconsistencies in the documents, and on December 3 he informed Kools of these discrepancies. (Def. 3(g) ¶¶ 40–41; Sharrow 7/10/96 Decl., Exs. 19–21) Between December 3 and 10, plaintiffs tried to get Jade to explain some of these discrep-

ancies. It is undisputed that by December 10, 1992, Kools and Oei were aware that Jade had submitted documents that contained discrepancies and were fraudulent. (Def. 3(g) ¶ 42; Sharrow 7/10/96 Decl., Ex. 29; W. Kools 9/9/96 Aff. ¶ 29) Although W. Kools advised Jade on December 11, 1992, that Kools was terminating its attempted purchase from Jade, the documents reveal that Kools continued to try to obtain conforming jeans from Jade. The documents show also that Hart strung Kools along, giving explanations and excuses for delay. (Sharrow 7/10/96 Decl., Exs. 31–33, 35–45) On January 25, 1993, Kools notified Citibank Int'l that the documents Jade submitted were fraudulent. (Sharrow 7/10/96 Decl., Ex. 46) However, as late as January 28, 1993, plaintiffs were sending mixed signals to Jade as to whether they wanted the goods or a refund. (Sharrow 7/10/96 Decl., Ex. 47) Only on January 30, 1993 did Kools unequivocally state that it wanted a refund. (Sharrow 7/10/96 Aff., Ex. 48)

The parties dispute the fate of the goods that were the subject of this transaction. Defendants claim that Jade eventually shipped two containers of jeans to Kools in December, 1992 and January, 1993. (Def. 3(g) ¶ 50) Defendants claim that these jeans arrived in the Netherlands on January 30, 1993, and on March 30, 1993, were seized by Dutch customs officials as counterfeit. (Def. 3(g) ¶ 51; Sharrow 12/4/96 Aff., Ex. 10) Plaintiffs claim that the confiscated goods were not intended for them and that no goods were shipped under the subject letter of credit. (Pl. 3(g) ¶¶ 38, 45–46; M.J.F.M. Kools 9/9/96 Aff. ¶ 8) It is undisputed that Kools never received conforming goods. (M.J.F.M. Kools 9/9/96 Aff. ¶ 8)

In 1993, Kools commenced an action against Jade in Florida, *Kools de Visser v. Jade–USA. Inc.*, No. 93–956 C116 (Fla.Cir. Ct.). According to the complaint, on February 6, 1993, Jade gave Kools a promissory note payable in 30 days, for $1,004,400, as a refund on the transaction. (Sharrow 7/10/96 Decl., Ex. 9) The settlement agreement between Kools and Jade, signed at the time Jade gave Kools the note, stated that,

Jade–USA has advised Kools de Visser that the goods shipped in fulfillment of the contract between Kools de Visser and Jade–USA are nonconforming to the contract.... [and] Kools de Visser has rejected the nonconforming goods and Kools de Visser's rejection of the nonconforming goods has been accepted by Jade–USA. (Sharrow 7/10/96 Decl., Ex. 13) Kools alleged that Jade failed to pay the note and that Hart failed to honor a personal guarantee on the note. (*Id.*) Kools obtained a default judgment against Jade, which remains unsatisfied. (Pl. 3(g) ¶ 44) In March 1996, Hart pleaded guilty in United States District Court for the Middle District of Florida to supplying Citibank with fraudulent documents. (Def. 3(g) ¶ 54; Pl. 3(g) ¶ 47)

Here, plaintiffs assert four claims, including: fraud and aiding and abetting Jade's fraud, against Citibank and Citibank Int'l; and wrongful honor of the letter of credit and conversion, against Citibank. Defendants move to dismiss pursuant to Rule 12(b)(6), or in the alternative for summary judgment, on all four claims. They move also to dismiss the fraud and aiding and abetting fraud claims under Rule 9(b). Plaintiffs oppose these motions and cross-move for summary judgment on the wrongful honor claim. Further, defendants claim that Kools lacks standing under the doctrine of res judicata. They move also to strike plaintiffs' demand for consequential and punitive damages, and for a jury trial.

## II.

A motion to dismiss pursuant to Rule 12(b)(6) may be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). On such a motion, the court must take all facts alleged in the complaint as true and draw all reasonable inferences in plaintiff's favor. *See Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 699–700 (2d Cir.1994).

█ Both plaintiff and defendant have submitted material outside the pleadings and treated this motion as one for summary judg-

ment. Accordingly, I have considered all the documents and affidavits submitted and apply the summary judgment standard in the alternative to the motion to dismiss. *See* Fed.R.Civ.P. 12(b),(c); *Kennedy v. Empire Blue Cross and Blue Shield,* 989 F.2d 588, 592 (2d Cir.1993); *Franklin H. Williams Ins. Trust v. Travelers Ins. Co.,* 847 F.Supp. 23, 24 (S.D.N.Y.1994), *rev'd on other grounds,* 50 F.3d 144 (2d Cir.1995). The standard for summary judgment is well-settled. On a motion for summary judgment, the moving party must prove the absence of material factual issues and that the law requires judgment in the moving party's favor. Fed.R.Civ.P. 56(c). When evaluating cross-motions for summary judgment, the court considers each motion separately, and on each views the facts in the light most favorable to the nonmovant. *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir. 1993). Actions on letters of credit are "well suited to determination by motion for *summary* judgment because they normally present solely legal issues relating to an exchange of documents." *Banque Worms v. Banque Commerciale Privee,* 679 F.Supp. 1173, 1178 (S.D.N.Y.), *aff'd,* 849 F.2d 787 (2d Cir.1988).

### III.

Again, Citibank moves to dismiss, or in the alternative, for summary judgment dismissing the wrongful honor claim. Plaintiffs cross-move for summary judgment granting this claim. Plaintiffs argue that before Citibank was permitted to honor the letter of credit, it was required to receive from Jade strictly conforming documents, that Jade presented Citibank with documents that did not strictly comply with the letter of credit's requirements, that Citibank paid anyway and then reimbursed itself from Oei's account, and that as a result of Citibank's breach, plaintiffs suffered damages because they lost the money and never received the goods. In opposition, Citibank argues that issues of fact remain as to whether: 1) the documents complied with the letter of credit requirements; and 2) plaintiffs waived expressly any discrepancies on the face of the documents. In addition, in support of its own motion for summary judgment, Citibank argues that

plaintiffs, by failing to promptly notify it of the facial discrepancies in Jade's documents and return the documents to it, waived their objections to the discrepancies by operation of law and cannot sue for wrongful honor.

 The following principles govern letters of credit.

> In its classic form, the letter of credit is only one of three distinct relationships between three different parties: (1) the underlying contract for the purchase and sale of goods between the buyer ("account party" [or applicant] ) and the seller ("beneficiary"), with payment to be made through a letter of credit to be issued by the buyer's bank in favor of the seller; (2) the application agreement between the bank and the buyer, describing the terms the issuer must incorporate into the credit and establishing how the bank is to be reimbursed when it pays the seller under the letter of credit; and (3) the actual letter of credit which is the bank's irrevocable promise to pay the seller beneficiary when the latter presents certain documents ... that conform with the terms of the credit.

*Alaska Textile Co. v. Chase Manhattan Bank, N.A.,* 982 F.2d 813, 815 (2d Cir.1992). The relationship between the applicant and the issuer is a separate contract, independent of the letter of credit relationship between the beneficiary and the issuer. *See* N.Y. U.C.C. § 5–109, cmt. 1 (McKinney 1991) ("The extent of the issuer's obligation to its customer is based upon the agreement between the two."); John F. Dolan, *The Law of Letters of Credit* ¶ 2.08[1], at 2–33–2–34 (rev. ed.1996) [hereinafter "Dolan I"] ("This contractual or statutory relationship [between issuer and applicant] is not a letter of credit, and parties to it may have no rights under the credit engagement."); *see also* Burton V. McCullough, *Letters of Credit* § 3.04[7], at 3–117 (1996). Unlike the issuer-beneficiary relationship, where special letter of credit rules apply, usual contractual principles govern the issuer-applicant relationship. *See Dibrell Bros. Int'l S.A. v. Banca Nazionale Del Lavoro,* 38 F.3d 1571, 1579 (11th Cir.1994) ("[T]he relationship between the issuer and customer is of a contractual nature governed

by the reimbursement agreement rather than the letter of credit."); *see also Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 494–96 (2d Cir.1995); Dolan I, *supra*, ¶ 2.09[4], at 2–45. As one commentator has noted:

> When the applicant disputes the issuer's conduct, that dispute generally involves the respective rights and duties of the two parties under the reimbursement agreement, an ordinary contract. In that context, the independence principle and Code rules fashioned for the letter of credit do not apply.... Those actions are normal contract actions governed by the law of contracts.

Dolan I, *supra*, ¶ 2.09[7], at 2–60–2–61; *see also Nutro Prods, Corp. v. NCNB Texas Nat'l Bank*, 35 F.3d 1021, 1023 (5th Cir. 1994). Here, plaintiffs' action is an applicant-issuer suit based on the Application Agreement.

### A. *Strict vs. Substantial Compliance*

To determine whether Citibank breached its contract and is liable for wrongful honor, we must look to the contract. The Application Agreement provides that "The Applicant will pay you [Citibank] on demand ... the amount of each draft or other request for payment ... drawn under the Credit." (Compl., Ex. A ¶ 1) However, it provides also that:

> Any action, inaction or omission taken or suffered by you or by any of your correspondents under or in connection with the Credit or any relative drafts, documents or property, if in good faith and in conformity with foreign or U.S. laws, regulations or customs applicable thereto, shall be binding upon the Applicant and shall not place you or any of your correspondents under any resulting liability to the Applicant.

(Compl., Ex. A ¶ 4)[2] Under the Application Agreement, therefore, Citibank is in breach if it does not properly carry out its responsibilities as a letter of credit issuer in conformity with laws, regulations, or customs applicable to the transaction.

■ Under the U.C.P. and New York law, the issuer must ensure before paying that the documents submitted by the beneficiary strictly comply with the letter of credit. *See United Bank Ltd. v. Cambridge Sporting Goods Corp.*, 41 N.Y.2d 254, 258–59, 392 N.Y.S.2d 265, 270, 360 N.E.2d 943, 948 (1976) ("[T]he beneficiary must meet the terms of ·the credit—and precisely—if it is to exact performance of the issuer.... There is no room for documents which are almost the same, or which will do just as well."); *see also Alaska Textile Co. v. Chase Manhattan Bank*, 982 F.2d 813, 816 (2d Cir.1992). This rule ensures that an issuer—a third party ignorant as to the specifics of the transaction—can decide quickly and reliably whether to pay by simply looking at the documents and determining whether they comply with the letter of credit's requirements, without the need to judge the significance of any discrepancies. *See* John F. Dolan, *Letter of Credit Disputes Between the Issuer and Its Customer: The Issuer's Rights Under the Misnamed "Bifurcated Standard"*, 105 Banking L.J. 380, 386 (1988); *see also Todi Exports v. Amrav Sportswear Inc.*, No. 95 Civ. 6701, 1997 WL 61063, *4 (S.D.N.Y. Feb.13, 1997). This standard applies to the issuer-beneficiary relationship, at least under New York law. *See United Bank*, 41 N.Y.2d at 258–59, 392 N.Y.S.2d at 270, 360 N.E.2d 943.

However, there is disagreement as to the standard applicable when an applicant sues an issuer for wrongful honor. Some courts hold that an applicant need demonstrate only that the documents did not strictly comply to recover against the issuer for wrongful honor. *See, e.g., Bank of Cochin Ltd. v. Manufacturers Hanover Trust Co.*, 612 F.Supp. 1533, 1539 & n. 8 (S.D.N.Y.1985) (dictum), *aff'd*, 808 F.2d 209 (2d Cir.1986). Other courts and commentators, however, have held that an applicant must show that the documents did not substantially comply with the letter of credit requirements in order to

---

**2.** In addition to the contractual right to reimbursement, both the U.C.P. and the U.C.C. provide the issuer with a right to reimbursement upon payment to the beneficiary. *See* U.C.P. 400 art. 16(a); *see also* N.Y. U.C.C. § 5–114(3) (McKinney 1991).

recover. *See Transamerica Delaval Inc., v. Citibank, N.A.*, 545 F.Supp. 200, 203–04 (S.D.N.Y.1982); *Data General Corp. v. Citizens Nat'l Bank*, 502 F.Supp. 776, 781 n. 5 (D.Conn.1980); McCullough, § 3.04[d][7], at 3–121–22. They reason that because the applicant's action against the issuer is based on a contract, general contract principles apply, including that a party may avoid performance, here reimbursement by the applicant, only if the breach is material—*i.e.,* if the issuer honors documents that do not substantially comply with the letter of credit's requirements. *See, e.g., Ocean Bank v. La Esquina Presidencial, Inc.*, 623 So.2d 520, 520 (Fla.Dist.Ct.App.1993) (dissenting opinion); Dolan I, *supra,* ¶ 7.05[3], at 7–108. Moreover, some courts have required—as in all breach of contract cases—that the issuer's payment despite substantial noncompliance prejudice the applicant or result in loss. *See, e.g., National Bank of North America v. Alizio,* 103 A.D.2d 690, 691, 477 N.Y.S.2d 356, 357–58 (1st Dep't 1984), *aff'd,* 65 N.Y.2d 788, 790, 493 N.Y.S.2d 111, 112, 482 N.E.2d 907, 908 (1985); *Chairmasters, Inc. v. Public Nat'l Bank & Trust Co.,* 283 A.D. 704, 127 N.Y.S.2d 806, 807 (1st Dep't 1954); *Bank of New York & Trust Co. v. Atterbury Bros., Inc.,* 226 A.D. 117, 234 N.Y.S. 442, 449 (1st Dep't 1929); *see also* Dolan, *supra,* 105 Banking L.J. at 400–04.

■ Even if the substantial compliance standard—the less demanding standard from the bank's point of view—applies, and even if plaintiffs must show that Citibank's payment despite substantial noncompliance prejudiced them, Citibank is liable for breach of the Application Agreement here because the documents Jade submitted in its final presentment did not substantially comply and Citibank's payment prejudiced plaintiffs.

■ In general, article 15 of U.C.P. 400 provides:

> Banks must examine all documents with reasonable care to ascertain that they appear, on their face, to be in accordance with the terms and conditions of the credit. Documents that appear, on their face, to be inconsistent with one another will be considered as not appearing, on their face,

to be in accordance with the terms and conditions of the credit.

U.C.P. 400, art. 15. Therefore, documents inconsistent on their face are not in accordance with the letter of credit requirements. In addition, although banks are not responsible if documents that are facially compliant are fraudulent, they must know and observe banking industry practice, and act in good faith. *See* U.C.P. 400 art. 17; 29 N.Y.Jur.2d, Credit Cards, § 35 (1983); *see also Resolution Trust Corp. v. Kimball,* 963 F.2d 820, 826–27 (5th Cir.1992) (noting importance of accepted banking industry standard in determining document compliance with letter of credit requirements); *S.B. Int'l. Inc. v. Union Bank of India,* 783 S.W.2d 225, 227 (Tex.App.1989) ("In making this document consistency determination, the issuer is charged with knowledge of banking industry practices. . . . "). Here, the letter of credit required six documents, with certain specific requirements for each, including: a draft, a commercial invoice, bills of lading, an inspection document, an insurance document, and a packing list. Plaintiffs claim that each of these documents contained facial discrepancies and inconsistencies.

### 1. *The Draft*

The letter of credit required that Jade submit a sight draft marked, "drawn under irrevocable letter of credit no. CCD6–1150–90019085 of Citibank N.A., New York, New York." (Compl., Ex. B) Plaintiffs argue that the draft Jade submitted contained several facial discrepancies, including: 1) it was not marked as drawn under this letter of credit (Colleran 9/7/96 Aff. ¶ 26); 2) it did not indicate that it was drawn at sight *(Id.* ¶ 27); and 3) it was not signed by the drawer, dated, and drawn payable to the order of a named party, as is required of all drafts *(Id.* ¶ 28). Defendant's expert, Alan L. Bloodgood, contends that these defects were not significant because the purpose of referring to the particular letter of credit—identifying it so that the bank can examine the documents against its requirements—was obviously fulfilled. (Bloodgood Aff. ¶ 56) Although Bloodgood may be correct that these discrepancies by themselves were not significant, he does not deny that these were facial

discrepancies, and that they may demonstrate, when combined with other discrepancies, that the documents did not substantially comply.

## 2. *The Invoice*

■ Plaintiffs argue that there were important facial discrepancies in the commercial invoice. The merchandise description set forth in the letter of credit as amended, and required in the invoice, was "LEVI JEANS 501–0191, NEW, ORIGINALS, MADE IN USA LABELS." (Compl., Ex. A, 11/2/92 amendment) The letter of credit required also one original invoice and four copies. "It is a well-established principle of letter of credit law that the description of the goods in the commercial invoice must mirror the description in the credit itself." Dolan I, *supra*, ¶ 1.07[1][b], at 1–38; *see* U.C.P. 400, art. 41(c). Jade submitted an original invoice that included "LEVI 501–0191, NEW, ORIGINALS, MADE IN USA LABELS" on one line, with the word "JEANS" typed right above the word "LEVI." (Compl., Ex. H) However, the copies of the invoice did not include the word "JEANS" at all. Apparently, someone had added the word "JEANS" to the original after the copies were made and neglected to include it in the copies. Thus, the invoice copies were not only facially discrepant, in that they did not contain the proper description of the goods, they also were not even true copies.

Bloodgood dismisses these discrepancies, stating that "[b]anks do not typically examine each apparent copy of a document with the same degree of care as the original"; rather, they "eyeball" them and count the copies to make sure that there are the correct number. (Bloodgood Aff. ¶ 61) Once again, Bloodgood does not contest the existence of a discrepancy. Nor does he contest its materiality. Indeed, this discrepancy was significant because a letter of credit transaction is intended to ensure receipt of the correct goods and therefore an exact description of the goods in the invoice is required. A misdescription of those goods—especially when a word as important as "JEANS" is left out—may signal a shipment of incorrect goods.

■ Rather, Bloodgood argues that this discrepancy would not have been discovered with the exercise of reasonable care. However, even a quick glance at the copies should have disclosed this discrepancy, given that the word "JEANS" in the original was added awkwardly above the word "LEVI" and therefore was out of place, and given that the description of the goods is the most important entry on the invoice. Moreover, in a letter of credit transaction, where the applicant places such reliance on the bank's inspection of the documents, banks cannot fulfill their responsibility merely by "eyeballing" documents. In fact, the "Group of Experts," a subcommittee of the International Chamber of Commerce Banking Commission, the committee that created the U.C.P., has stated that "if a commercial invoice is required in quintuplicate, the original and all copies are to be *identical in every respect.* It is a discrepancy if they are not." (Colleran 1/20/97 Aff. ¶ 18, *quoting* International Chamber of Commerce, *More Case Studies on Documentary Credits*, ICC Publication No. 489 (Jan Dekker ed.1991) (emphasis in original)) Therefore, Citibank's attempt to dismiss this discrepancy is unavailing.

## 3. *The Bills of Lading*

The letter of credit required that Jade submit a "marine/on board original ocean bill of lading or container bill of lading or bill of lading bearing container endorsement (if more than one original has been issued, all originals are required)." It required also that the bills of lading be issued to the order of Kools de Visser, and marked "notify Rudy T. Oei, 25 Wascussue Court, New Canaan, CT 06840," and "freight paid."

Plaintiffs point out several facial discrepancies in the bills of lading, as well as defects that they claim should have alerted Citibank that the bills were fraudulent, including: 1) the purported original bills of lading contained crossed-off or blocked-out areas which typically show that they are actually carbon copies (Colleran 9/7/96 Aff. ¶ 8); 2) they contained an unusual stamp, "clean on board" (*Id.* ¶ 9); 3) the purported multiple originals, which should have contained identical information, differed from each other in several

ways, including: a) on two out of the three, the box marked "To be prepaid" is checked, but on the third it is empty; and b) the export reference number and zip code for the forwarding agent differ (*Id.* ¶ 10); 4) that two of the documents included "x" marks in the "To be prepaid" box demonstrates a substantive discrepancy as well because it conflicts with the letter of credit requirement that the bills of lading be marked as prepaid (*Id.* ¶ 11); and 5) one of the bills of lading, under the heading "Marks and Numbers," notes "CLEAN BOXES," while the other two note "PLAIN BOXES" (*Id.* ¶ 12).

Under U.C.P. 400, art. 26, an issuer must accept a marine bill of lading if, *inter alia*, it appears on its face to have been issued by a named carrier, consists of a full set of originals, and meets all the stipulations of the credit. Citibank's expert Bloodgood argues first, that the crossed-out spaces on the purported originals "is not a proper basis for rejecting an otherwise complying presentation." (Bloodgood Aff. ¶ 65) However, he does not state that plaintiffs are incorrect in noting that usually only copies have such blocked-out areas and that a bank document examiner should have been aware of that. (*see also* Castellanos 10/21/96 Aff. ¶ 10) Because the crossed-out spaces showed that these were copies, not originals as required by the letter of credit and the U.C.P., this was a discrepancy.

Second, Bloodgood notes that bills of lading sometimes contain a stamp "Clean on Board." (Bloodgood Aff. ¶ 68) Therefore, that does not seem to be a clear undisputed discrepancy. Third, Bloodgood claims that, for the same reasons noted above in relation to the copies of the invoice—*i.e.*, that examiners only "eyeball" copies—Citibank's failure to detect differences between the original bills of lading—including the differences in the export reference number, the zip code of the forwarding agent and the "To be prepaid" box—did not constitute a lack of reasonable care. However, such an argument disregards that all three of the bills of lading were to be originals, not copies. Even if Bloodgood is correct that banks need only "eyeball" copies, this cannot excuse inspection of originals. Therefore, these were dis-

crepancies. The fourth problem with the bills of lading—*i.e.*, that two of the originals showed that total charges were "To be prepaid"—also was a facial discrepancy. Article 31 of U.C.P. 400 provides,

b. If a credit stipulates that a transport document has to indicate that freight has been paid or prepaid, banks will accept a transport document on which words clearly indicating payment or prepayment of freight appear by stamp or otherwise ...
c. The words "freight repayable," "freight to be prepaid," or words of similar effect if appearing on transport documents, will not be accepted as constituting evidence of the payment of freight.

Thus, two of the purported originals were facially discrepant because they indicated that the goods were "to be prepaid." That discrepancy is significant because the party picking up the goods may have to pay the freight. Finally, Bloodgood dismisses the differences in the designation of the markings on the boxes—"clean boxes" vs. "plain boxes"—by stating that these terms mean only that the boxes were unmarked. (Bloodgood Aff. ¶ 70) This discrepancy, although it does demonstrate a failure to ensure that the multiple originals were identical, is not otherwise significant.

#### 4. *The Inspection Document*

The original letter of credit required that Jade submit a "Certificate of Compliance of quality and inspection by Buyer/Agent AND unbiased professional firm such as Lloyds of London, SGS or other acceptable to both Buyer and Seller." (Compl., Ex. A) However, an amendment to the letter of credit stated specifically: "Certificate of Inspection by Lloyd [*sic*] of London is required." (Compl., Ex. B)

Plaintiffs claim that the inspection document was discrepant in several ways, including: 1) it purported to be issued by an agent for Lloyds of London, not by Lloyds of London itself as the letter of credit required, and was a report, not a "certificate" (Colleran 9/7/96 Aff. ¶ 17; Colleran 1/20/97 Aff. ¶ 34); 2) it was inconsistent with the bills of lading because it showed a total of 900 boxes, not 1800 boxes as the bills of lading noted (*Id.*

¶ 18); and 3) it described the merchandise as "Levi JEANS 501 0191 NEW *ORLEANS,* MADE IN USA LABELS" (*Id.* ¶ 19) (emphasis added), and this was inconsistent with the invoice description as "new, original" jeans.

Citibank's sole defense is that plaintiffs waived these discrepancies. That issue will be addressed below, where I find that there is no evidence that any of these discrepancies were waived. However, Citibank does not contest that these discrepancies existed. Further, they were material and substantial. The requirement that a beneficiary submit an inspection report is the only way to ensure that the beneficiary has provided conforming goods before it receives payment.

### 5. *The Insurance Document*

The letter of credit required that Jade submit an "insurance policy and/or certificate", with "insurance to include war risk." (Compl., Ex. B) Plaintiffs identify several discrepancies in the insurance document Jade submitted including: 1) it purported to be a "marine open cargo policy," which is a general policy that would not cover individual shipments (Colleran 9/7/96 Aff. ¶ 13); 2) it did not identify itself as a "certificate" or a "policy", as required by the U.C.P. (*Id.* ¶ 14); 3) it did not identify the particular shipment that it covered (*Id.* ¶ 15), which would have made it difficult for plaintiffs to enforce any claim (Colleran 1/20/97 Aff. ¶ 8), *see, e.g., Sunlight Distrib., Inc. v. Bank of Communications,* No. 94 Civ. 1210, 1995 WL 46636, at *4 (S.D.N.Y. Feb. 7, 1995); and 4) it did not, as required by U.C.P. 400, art. 37(b), cover 110% of the value of the shipment, but was $800 short (*Id.* ¶ 16). Citibank does not attempt to refute these discrepancies. (Bloodgood Aff. ¶ 74) It argues merely that these discrepancies in the insurance document could not have caused plaintiffs any losses if no goods were shipped or if nonconforming goods arrived safely, the two possible factual scenarios in this case. Once again, however, Citibank does not contest that such discrepancies, when taken together with others, may demonstrate substantial noncompliance.

### 6. *The Packing List*

Plaintiffs claim that the packing list was discrepant and reflected fraud in several ways: 1) it gave the "DATE SHIPPED" as a week later than when the packing list was purportedly created (Colleran 9/7/96 Aff. ¶ 21); 2) in one space, it stated that the shipment contained 900 cartons, and in another, 1800 boxes (*Id.* ¶ 22); 3) it was inconsistent with the bills of lading as to the weight of the shipment and the shipment date (*Id.* ¶¶ 23–24); and 4) it did not show the specific batch of merchandise it covered (*Id.* ¶ 25).

Citibank counters first that the shipment date may have been an anticipated shipment date. (Bloodgood Aff. ¶ 79) However, immediately preceding the shipment date entry is a line for "APP. SHIP WEEK" and "11 23 92" is filled in. Citibank's expert does not explain why, if the shipment date was intended to be an anticipated date, the word "APP." was not included before "DATE SHIPPED." In addition, the packing list used the term "DATE SHIPPED", in the past tense, implying that the goods had already been shipped. Therefore, when the packing list, dated November 17, 1992, showed a shipment date of November 24, it reflected an internal inconsistency and should have raised suspicion in the mind of the document checker.

Defendant argues second that there is no necessary inconsistency in the number of cartons or boxes because the jeans could have been packed with two boxes in each carton. (Bloodgood Aff. ¶ 81) However, the bills of lading stated that there were 1800 boxes in the shipment. Bills of lading would show only the number of visible boxes because that is all the shipper is concerned about. If two boxes were packed in one carton, the bills of lading would show 900 boxes or cartons. Therefore, if Citibank is correct and the packing list should have been read by the document examiner as showing that two boxes were packed in each carton, the packing list would be inconsistent with the bills of lading. Citibank does not contest the inconsistency in the weight of the goods between the packing list and the bills of lading—the packing list stated that the goods weighed 64,800 lbs. and the bills of lading stated that they weighed 38,000 lbs. Nor does the bank contest that the bills of lading

showed the shipment date as November 23 and the packing list showed it as November 24. Finally, Citibank notes correctly that because the packing list need refer only generally to the goods and the packing list does so, its failure to refer to the specific batch of merchandise is not a discrepancy.

### 7. Application of the Substantial Compliance Test

■ When evaluating whether documents substantially comply with letter of credit requirements, it is important to keep in mind that a bank deals only in documents and that errors that may seem inconsequential in other settings may be significant in documents associated with a letter of credit. The documents Jade submitted contained 17 discrepancies or inconsistencies which Citibank should have discovered in the exercise of reasonable care. Moreover, many of the defects in the documents were significant in that they were directly related to the existence, quality and quantity of the goods, including: 1) the absence of the word "JEANS" in the invoice copies; 2) the crossed-out areas of the bills of lading purporting to be originals and the differences in information between bills of lading; 3) the identity of the inspecting party as an entity other than Lloyds of London; 4) the inconsistency between the number of boxes in the shipment listed on the inspection document and on the bills of lading (900 vs. 1800); 5) the description of the goods in the inspection document as "New Orleans" rather than "New, Original"; 6) the inconsistency in the number of boxes in the shipment both within the packing list and in relation to the bills of lading; 7) the packing list's specification of a shipment date seven days after the list was purportedly created; and 8) the inconsistency between the weight of the goods listed in the packing list, 38,000 lbs., and the weight listed in the bills of lading, 64,800 lbs. Courts have found substantial compliance lacking in situations where the beneficiary's documents contained much less significant and extensive discrepancies than are present here. See, e.g., Brul v. MidAmerican Bank & Trust Co., 820 F.Supp. 1311, 1313–14

(D.Kan.1993) (holding that documents did not substantially comply where copies of letter of credit and promissory note were submitted, and letter of credit required originals); Rhode Island Hosp. Trust Nat'l Bank v. Eastern General Contractors, Inc., 674 A.2d 1227, 1230–31 (R.I.1996) (trial court directed verdict finding no substantial compliance because beneficiary failed to submit sight draft with presentment; Supreme Court reversed on other grounds).

Moreover, plaintiffs were prejudiced by Citibank's payment despite these discrepancies because the discrepancies related directly to the existence and quality of the goods and plaintiffs never received conforming goods. Taking all these discrepancies and inconsistencies together, no reasonable jury, properly instructed on the nature of the letter of credit transactions and the exacting obligations of the beneficiary and the issuer thereunder, could find that the documents submitted by Jade substantially complied with the letter of credit requirements.[3]

■ Citibank argues that plaintiffs' losses were caused by Jade's fraud, not by Citibank's failure to comply with its obligations under the Application Agreement. However, as in any breach of contract case, Citibank's breach need be only the "but for" cause of the loss. See Brown v. Lockwood, 76 A.D.2d 721, 742–43, 432 N.Y.S.2d 186, 201 (2d Dep't 1980); Krofft Entertainment, Inc. v. CBS Songs, 653 F.Supp. 1530, 1534 (S.D.N.Y.1987). Here, by honoring the documents, Citibank breached the Application Agreement. No one disputes that Kools never received conforming, or even nearly conforming goods; however, Citibank reimbursed itself from Oei's account. Citibank's breach caused the loss because if Citibank had not honored Jade's substantially nonconforming documents, plaintiffs would have sustained no direct losses—they would not have paid for the goods they never received. If Citibank had not honored the noncomplying documents, Jade's fraud would not have succeeded.

---

**3.** Because I find that the third and final presentment did not comply on its face with the letter of credit, I need not address the issue of whether

Citibank N.A. should have been aware that the documents were fraudulent and therefore should have rejected them on that basis.

Further, Jade's fraud was not an intervening cause. An intervening cause is one which "comes between the initial force or occurrence and the ultimate effect." *Black's Law Dictionary* 201 (5th ed.1979). Jade's fraud was ongoing and did not break the chain of causation; that fraud could not have succeeded had Citibank not breached its duty. Citibank's argument would essentially permit a bank to avoid liability whenever it honored noncomplying documents so long as the beneficiary also committed fraud. In addition, under New York law, where "the intervening, intentional act of another is itself the foreseeable harm that shapes the duty imposed, the defendant who fails to guard against such conduct will not be relieved of liability when that act occurs." *Kush v. City of Buffalo,* 59 N.Y.2d 26, 33, 462 N.Y.S.2d 831, 835, 449 N.E.2d 725, 729 (1983). Among the purposes of requiring conforming documents is to ensure that the goods delivered by the beneficiary conform to the underlying contract between the applicant and the beneficiary and to guard against the beneficiary's fraud. Citibank cannot claim that Jade's fraud or failure to supply the goods was an intervening cause because that was one of the evils Citibank was supposed to guard against by closely examining the documents; the harm was foreseeable, and its avoidance was one of the principal reasons for using a letter of credit to make payment.

## B. *Waiver or Estoppel*

### 1. *Express Waiver*

Citibank argues that an issue of fact exists as to whether plaintiffs waived expressly the facial discrepancies in the documents before Citibank paid Jade. The bank claims that one of its employees contacted Oei after Citibank had received the documents from Citibank Int'l and obtained his express waiver of all discrepancies. However, because the evidence shows definitively that Oei, and even the bank, were unaware of most of the discrepancies when Oei is alleged to have waived them, Citibank has failed to present evidence sufficient to create a genuine issue of fact as to whether Oei waived the substantial compliance requirement.

Where documents do not strictly comply with letter of credit requirements, an issuer may request an express waiver from the applicant. *See Alaska Textile Co.,* 982 F.2d at 824; *Western Int'l Forest Prods., Inc. v. Shinhan Bank,* 860 F.Supp. 151, 155 (S.D.N.Y.1994); *see* also Dolan I, *supra,* ¶ 6.06[1][b], at 6–68 ("Most of the time … the issuer obtains a waiver of the defects from the applicant and pays the beneficiary with notice that it is making payment despite nonconformities."). A waiver is the "intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it." *United Commodities–Greece v. Fidelity Int'l Bank,* 64 N.Y.2d 449, 457, 489 N.Y.S.2d 31, 34, 478 N.E.2d 172, 175 (1985) (quotations and citations omitted); *see also Voest–Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.,* 707 F.2d 680, 685 (2d Cir.1983); Dolan I, *supra,* ¶ 6.06[2], at 6–74 ("Waiver, unlike estoppel, requires a showing that the party making the waiver does so knowingly."). Therefore, a party cannot waive discrepancies in a letter of credit unless it is aware of them at the time of the waiver. *See United Commodities–Greece v. Fidelity International Bank,* 99 A.D.2d 974, 975, 473 N.Y.S.2d 10, 12 (1st Dep't 1984), *aff'd,* 64 N.Y.2d 449, 456–57, 489 N.Y.S.2d 31, 34, 478 N.E.2d 172, 175 (1985) ("[T]here can be no waiver until the facts which are being waived are known to the person to be charged with the waiver." (quotations and citation omitted)); *see also Transamerica Delaval Inc.,* 545 F.Supp. at 202 n. 3; *Instituto Nacional de Comercializacion Agricola (Indeca) v. Continental Ill. Nat'l Bank & Trust Co.,* 530 F.Supp. 279, 285 (N.D.Ill. 1982); *Overseas Trading Corp. v. Irving Trust Co.,* 82 N.Y.S.2d 72, 75 (Sup.Ct. New York County 1948).

Here, Citibank failed to present evidence that Oei was aware of most of the facial discrepancies at the only time he is alleged to have waived them expressly. Plaintiffs claim that Citibank told Oei on December 2, 1992, that Citibank Int'l had not forwarded the original inspection document with the rest of the documents, but that he could get a copy of it when he picked them up. They claim that Oei approved payment despite the ab-

sence of an original inspection document (Pl. 3(g) ¶¶ 31–32; Sharrow 1/10/96 Decl., Ex. 5 at 82–83; Oei 1/21/97 Aff. ¶ 4), but that he was never advised of any facial discrepancies in Jade's documents and did not affirmatively waive such discrepancies, including those within the inspection document. (Pl. 3(g) ¶¶ 30, 33–34; Oei 1/21/97 Aff. ¶ 7)

Citibank claims it told Oei that it had not received the original inspection report and that Citibank Int'l was faxing it that day. It claims also that Oei "did not object to payment." (*See* Def. 3(g) ¶¶ 33–34) In addition, Wade Walker, the Citibank employee who was in contact with Oei, states,

> When I told [Oei] about the alleged discrepancies and received his approval to pay, Mr. Oei was quite cavalier. He said that he simply wanted to get the deal done, that discrepancies were no big deal, and that he was not interested in the details of any discrepancies. I advised Mr. Oei that the bill of lading omitted the words "Jeans," that the original of the inspection certificate was missing, and that the packing list left out the beneficiary's name. Nevertheless, Mr. Oei expressed no concern at all. Instead, he just wanted N.A. to make payment and get the deal done.

(Walker 10/28/96 Aff. ¶ 22) It is evident from this statement that Walker did not notify Oei of most of the particular discrepancies in the documents. Although Walker refers generally to "the alleged discrepancies," he then specifies only three: the omission of the word "JEANS" from the bills of lading, the absence of an original inspection certificate, and the exclusion from the packing list of the beneficiary's name. Walker was the only Citibank representative who claims to have spoken to Oei and even he does not claim that he told Oei of other discrepancies, or even that he told Oei that Citibank did not have a photocopy of the inspection report and could not check it for compliance.[4]

There are reasons to believe that the bank itself was unaware of the other discrepancies at the time Walker spoke to Oei, and there-

fore that Walker could not have informed Oei of those discrepancies. First, the discrepancy report compiled by Citibank employee Rose Williams contains only one of the 17 discrepancies noted above. (Compl., Ex. I) Walker did not see the documents and Williams was his only source as to the discrepancies; therefore, there is no reason to believe that Walker was even aware of the other discrepancies, much less that he informed Oei of them. Second, Williams admits that she did not even receive the fax copy of the inspection report from Citibank Int'l until 12:17 p.m. on December 2, 1992, seven minutes after she received approval from Carlo to pay Jade. (Williams 7/2/96 Aff. ¶ 5) It was impossible for Walker to have notified Oei of the discrepancies in the inspection report when Citibank had not yet received this report from Citibank Int'l at the time Walker spoke to Oei. Third, Castellanos, the document checker at Citibank Int'l, testified in a previous action that, in a chronology prepared in January, 1993, he recorded that Williams called him on December 2, 1992 about three discrepancies: the missing inspection certificate, the omission of the word "jeans" in the bills of lading, and the packing list's omission of the beneficiary's name. (Regal 1/22/97 Decl. ¶ 7 & Ex. C) Castellanos then recorded in his chronology that he informed her that the second two were not discrepancies; the only discrepancy remaining was the missing original inspection certificate. (*Id.*) Significantly, this is the only discrepancy that Oei concedes he heard about. Fourth, plaintiffs' expert notes that waived discrepancies are usually noted on the payment advice given to the applicant with the documents. (Colleran 9/7/96 Aff. ¶ 40) No such waivers were noted on the payment advice Citibank gave Oei. (Compl., Ex. J)

Walker claims that after he informed Oei of the discrepancies—*i.e.*, the three that he lists—Oei was cavalier and stated that he just wanted to get the deal done and that discrepancies were no big deal. However, a

---

4. Although Rose Williams, Citibank's Trade Service Representative who examined the documents, states that she believed that Oei had approved payment despite the absence of any inspection report, even a copy (Williams 11/4/96

Aff. at 2 n. 3), this is insufficient to create an issue of fact because she does not claim to have spoken directly to Oei, or even to Walker, and thus cannot testify to the details of Oei's alleged waiver.

cavalier attitude and a statement about wanting to get the deal done after being told of three discrepancies—technical discrepancies which do not rise to the level of substantial noncompliance—does not create an issue of fact as to the waiver of 17 other discrepancies, some significant and together rising to the level of substantial noncompliance, when both Oei and Walker were unaware of those discrepancies. Without knowledge of the particular discrepancies, or at least that discrepancies of such a magnitude existed, Oei could not waive them. *See, e.g., United Commodities–Greece*, 64 N.Y.2d at 457, 489 N.Y.S.2d at 34, 478 N.E.2d at 175.

Citibank points out that the Application Agreement contains a clause that provides that the bank "may act in reliance on any oral, telephonic, telegraphic, electronic or written request or notice believed in good faith to have been authorized by the Applicant, whether or not given or signed by an authorized person." (Compl., Ex. A) However, this clause merely permits the bank to proceed on its good faith belief that it was the applicant that authorized a certain action rather than someone other than the applicant; it does not permit a finding of waiver where there could be none. Nor could the bank believe in good faith that Oei had waived all discrepancies because the bank itself was unaware of them at that time. Citibank has not raised an issue of fact as to Oei's express waiver of the facial discrepancies.

### 2. *Waiver by Operation of Law*

Citibank argues next that plaintiffs, by failing to object promptly to the facial discrepancies in Jade's documents and to return those documents to Citibank, waived their right to sue for breach of the Application Agreement. They claim that an applicant has a duty to notify the issuer within a reasonable time after receiving the documents that they do not comply with the letter of credit requirements, and to return those documents to the issuer. A failure to do so, according to Citibank, results in a waiver of discrepancies that "operates as a matter of law." (Def. 12/4/96 Mem. at 13)[5]

If an applicant has no duty to inspect the documents promptly, report discrepancies and return the documents, no waiver can result from its failure to do so. There is no well-developed and authoritative body of law governing an applicant's duty to inspect and return documents. However because such a duty has no basis in the law governing this transaction and makes little sense in the scheme of letter of credit transactions, I find that no such duty exists and that an applicant does not, by operation of law, waive its right to sue for breach of the application or reimbursement agreement by failing to object promptly and to return the documents to the issuer.

First, the Application Agreement does not require that plaintiffs notify Citibank of any facial discrepancies in Jade's documents or return those documents. In fact, plaintiffs have submitted examples of other application agreements which provide explicitly that an applicant that fails to notify the issuer within a specified period of time of facial discrepancies in the documents waives its objections. (Colleran 9/7/96 Aff., Ex. I) As plaintiffs' expert Colleran noted, "Banks that do require such notification insert that requirement in their application agreements." (Col-

---

**5.** The Second Circuit has described recently, in a different context, the different types of "implied" waiver:

The concept of an "implied waiver" can have at least three meanings. First, such a waiver can mean that an actor intended to waive a protection, even though it did not say so expressly. Second, an implied waiver might arise whenever an act has been taken under circumstances that would lead a reasonable observer to conclude that the act generally manifests an intent to waive, whether or not the actor had such intent in the particular case. Both of these meanings involve a requirement of intentionality, the first being sub-

jective and the second objective. A third meaning is that the law deems an actor to have surrendered a protection, regardless of the actor's subjective or objectively reasonable intent. Waiver in this third sense is more properly termed "forfeiture."

*Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 243 (2d Cir.1996). Citibank seems to argue that plaintiffs' failure to object amounted to a forfeiture, rather than one of the two types of "implied waiver" which require some showing of subjective or objective intent to waive, and therefore I address this forfeiture argument only. (Def. 12/4/96 Mem. at 4 n. 7)

leran Aff. ¶ 42) Here, the parties did not contract for such an obligation.

Second, there is no support in the U.C.P. 400 for an automatic waiver or preclusion arising from the applicant's failure to object promptly to discrepancies. Article 16 of U.C.P. 400 requires that the issuing bank notify the beneficiary of acceptance or rejection of documents within a reasonable time and, in Article 16(e) states that if it fails to do so, "the issuing bank shall be precluded from claiming that the documents are not in accordance with the terms and conditions of the credit." However, this section imposes no obligation on the applicant and concerns only the issuer's obligations to the beneficiary.

*Linkers (Far East) Pte., Ltd. v. International Polymers, Inc.*, No. 94 Civ. 9226, 1996 WL 412854 (S.D.N.Y. July 23, 1996), is not to the contrary. There, the Court barred a claim by the applicant against the confirming bank because the issuer failed to object promptly to the confirming bank. *Linkers*, 1996 WL 412854, at *1; *see also Linkers*, Amended Verified Complaint ¶¶ 18–29 (filed Jan. 18, 1995). The Court said nothing of an applicant's duty to an issuer. The *Linkers* Court based its ruling on U.C.P. 500, art. 14(e), the successor to U.C.P. 400, art. 16(e), which extends the waiver rule to confirming banks which fail to object promptly to the beneficiary. This revision easily could have extended the waiver rule to applicants if the drafters had so desired. *See* International Chamber of Commerce, Uniform Customs and Practice for Documentary Credits (1993 Version), art. 14.

In addition, New York statutory law does not impose a duty on the applicant to object promptly. The official Comment to U.C.C. § 5–113(2), which seems to imply that an applicant has ten days to object to documents, does not impose such a duty. First, this provision does not govern here because the Application Agreement provides that the U.C.P governs and therefore the U.C.C. is inapplicable. *See* N.Y. U.C.C. § 5–102(4) (McKinney 1991); *Habib Bank Ltd. v. Convermat Corp.*, 145 Misc.2d 980, 554 N.Y.S.2d 757, 758 (Sup.Ct., App. Term, 1st Dep't 1990). Second, even if this provision were applicable, the only support that the Com-

ment provides for a prompt objection rule is an analogy to U.C.C. § 2–605(2), which governs transactions in which documents are sold. However, a sale of goods where the goods are documents is radically different from a letter of credit transaction: no bank has been hired to ensure the documents' strict compliance with a letter of credit before payment; rather, the person accepting the goods has the primary responsibility for examining the documents to ensure compliance.

Third, under contract law principles, plaintiffs did not waive by operation of law their right to object to Citibank's breach. Under New York contract law,

> [w]here a contract is broken in the course of performance, the injured party has a choice presented of him of continuing the contract or of refusing to go on.... If the injured party chooses to go on, he loses his right to terminate the contract because of the default.

*Emigrant Industrial Sav. Bank v. Willow Builders, Inc.*, 290 N.Y. 133, 144, 48 N.E.2d 293 (1943). The act that conveys the election to waive the breach is either the continuation by the nonbreaching party of performance under the contract, or acceptance by the nonbreaching party of the breaching party's continued performance without objection. *See Bigda v. Fischbach Corp.*, 898 F.Supp. 1004, 1011 (S.D.N.Y.1995), *aff'd*, 101 F.3d 108 (2d Cir.1996). Such an election can occur only if the contract is a "continuing contract." *See Apex Pool Equip. Corp. v. Lee*, 419 F.2d 556, 562 (2d Cir.1969). Here, the Application Agreement was no longer executory after Citibank had paid the beneficiary and taken reimbursement from Oei's account. Rather, Citibank's and plaintiffs' performances under the Application Agreement were completed and the contract was not continuing. Therefore, plaintiffs did not waive Citibank's breach by failing to notify Citibank of their objection.

Fourth, New York case law has not created a *per se* rule barring an applicant from objecting to an issuer's honor if the applicant does not object and return the documents promptly. Rather, the cases Citibank cites in support of such a rule all seem to use the

applicant's failure to object to the documents as evidence supporting the view that the discrepancies were trivial and were unrelated to any loss. In none of these cases did the Courts hold that an applicant waives its right to object to the discrepancies by operation of law.

For example, in *Bank of New York & Trust Co. v. Atterbury Bros., Inc.*, 226 A.D. 117, 234 N.Y.S. 442 (1st Dep't 1929), *aff'd*, 253 N.Y. 569, 171 N.E. 786 (1930), the issuer sought reimbursement from the applicant after it paid on a letter of credit. The applicant argued that it was not obligated to reimburse the issuer because the documents submitted by the beneficiary did not strictly comply with the requirements of the letter of credit and the goods were never delivered. The applicant noted discrepancies in the documents such as: 1) the draft was drawn by "A. James Brown", but the letter of credit was in favor of "Arthur James Brown"; 2) the shipping documents identified the goods as "unground casein," not "casein" as required by the letter of credit; 3) the beneficiary failed to attach a certificate stating that all required documents had been sent to the issuer, when in fact all required documents were actually attached to the drafts sent to the issuer; and 4) the bill of lading was misdated. *Id.* at 445–448. The applicant never received the goods because the documents were forgeries. The Court found that the discrepancies in the documents to which the applicant objected were "raised [as] an afterthought based upon a search to discover any kind of flaw." *Id.* at 449. It noted that "[t]he flaws discovered are not only trivial in themselves, but have no the *[sic]* slightest causal relationship to the damage." *Id.*[6] The

Court noted that the applicant had retained the documents without protest for two weeks. However, the Court referred to the applicant's failure to protest as additional evidence merely of the "inconsequentiality" of the discrepancies, rather than of a waiver. *Id.*[7] *Atterbury* does not establish a *per se* rule.

*Atterbury* is distinguishable because here the documents did not substantially comply with the letter of credit requirements and the issuer's failure to reject the documents prejudiced the applicant. Moreover, plaintiffs did not raise these discrepancies in the documents long after the fact. They raised many of these objections with Jade soon after receiving the documents. (Sharrow 7/10/96 Decl., Exs. 20–25) In addition, unlike most of the other cases Citibank cites, neither party disputes that plaintiffs never obtained the goods, nor used the documents to obtain the goods. Accordingly, I need not decide whether accepting the goods amounts to a waiver of defects in the documents.

Beyond the lack of authority to support an automatic waiver arising from the applicant's failure to object and return the documents, such a rule makes little sense in a letter of credit transaction. First, in such a transaction, the issuer is the one party charged with, and paid to undertake, the duty of scrutinizing documents. The issuer is often selected for its expertise in such transactions; its familiarity with the U.C.P., normal banking usage, and the proper format of shipping or other types of documents is assumed. No such familiarity is required for the applicant to participate in the transaction, nor does logic suggest that the applicant necessarily would have such familiarity. One who deals

---

**6.** At one point, the Court stated that the applicant was estopped to object to the "unground casein" discrepancy. However, the Court's finding of estoppel was based on the applicant's statement approving the documents despite its apparent awareness of the discrepancy, not its failure to object, and therefore is essentially a finding of express waiver.

**7.** Other cases cited by Citibank did not establish a *per se* rule on waiver and instead based their decisions on unique facts. In *Dorf Overseas Inc. v. Chemical Bank*, 91 A.D.2d 895, 457 N.Y.S.2d 513 (1st Dep't 1983), the applicant acted in a manner that could be interpreted as a waiver: he

sold the goods although they failed inspection. Further, the transaction required expressly the return of the documents if they were non-compliant and the applicant did not return them. In *Williams Ice Cream Co. v. Chase Nat'l Bank*, 210 A.D. 179, 205 N.Y.S. 446 (1st Dep't 1924), the applicant's redemption and use of the goods, despite a facial discrepancy, demonstrated affirmatively that the applicant was aware of the discrepancy and waived it by actually taking possession of the goods. Further, the applicant's acceptance of the goods rendered this defect in the bill of lading irrelevant because he suffered no damages.

in widgets may be presumed to be familiar with widgets or the market in widgets, not necessarily with the documents that underlie a shipment of widgets or the U.C.P. To assume otherwise is to overlook the commercial setting of the contract, something courts should not do. *See Lafer Amster & Co. v. Stone Container Corp.*, 690 F.Supp. 1356, 1360 (S.D.N.Y.1988). Therefore, if there are discrepancies, it is the bank that should have to seek an express waiver from the applicant; the issuer should not avoid responsibility for failing to notice discrepancies because the applicant was slow to scrutinize the documents closely or because the applicant was slow to inform the issuer of such discrepancies. Moreover, the bank's responsibilities remain the same whether or not the applicant must notify it promptly of discrepancies; it must pay if the documents strictly comply and deny payment if they do not. Requiring that applicants inspect documents independently defeats the purpose of retaining the issuer, erodes the bank's responsibility to perform its role diligently, and may result in the bank avoiding liability despite negligent payment. If banks want to require an applicant to report discrepancies promptly, they may include a provision in the application agreement limiting the time within which the applicant must give notice of facial discrepancies and return the documents.

Second, the absence of an automatic waiver rule does not prejudice the issuer. In most situations, the issuer has already paid the beneficiary and the applicant's delay in notifying the issuer of facial discrepancies can cause the issuer no prejudice. As one commentator has noted, "The exigencies of the letter of credit transaction, in which issuers must pay promptly, are not evident in the reimbursement context." Dolan I, *supra*, ¶ 2.09[7], at 2–60. It is arguable that where prejudice can be shown, the issuer should be able to claim a waiver, or at least that the applicant should be estopped to claim wrongful honor. However, such a rule is unworkable. If the determination of whether the applicant has waived facial discrepancies depended upon the prejudice to the issuer, the applicant's responsibilities would be unpredictable. A bright-line rule around which parties can plan is preferable.

On the other hand, the sequence of events in the typical letter of credit transaction suggests that a rule requiring the applicant to return discrepant documents to the issuer may prejudice the applicant. Such a rule ignores both the issuer's collateral and the applicant's superior ability to mitigate damages that result from the issuer's wrongful honor of the letter of credit. In letter of credit transactions, the issuer typically requires that an applicant post security for the letter of credit. *See, e.g.*, Dolan I, *supra*, ¶ 3.07[3], at 3–28 ("[I]f [the bank is] not satisfied that the applicant is able to reimburse the bank immediately upon the bank's honor of drafts under credit, the bankers will insist on whatever collateral or guaranties necessary in order to make the bank's 'loan' of credit to its customer bankable."), ¶ 9.03[5] at 9–54 ("The careful issuer often insists that the applicant put the issuer in funds at some time before payment is due."). The bank is entitled to reimbursement immediately after it honors the letter of credit and will seek such reimbursement as soon as possible by collecting the security. *See, e.g.*, U.C.P. 400, art. 16(a). Unless the issuer concedes that it erred, when the applicant returns the allegedly discrepant documents, nothing compels the issuer to return the reimbursement. If the applicant is required to return the documents to preserve its objections, the applicant will lose the only security it has: the documents. The bank will have both the reimbursement or collateral and the documents. This would prejudice the applicant because it will have paid the issuer and be left without any documents with which to obtain whatever goods may have been shipped.

In addition, the applicant is in a better position to mitigate damages. The applicant is the party that ordered the goods and presumably has use for the goods. Further, it is likely that the applicant will be more familiar than the issuer with the market should he be unable to use the goods. There is little danger that the applicant will not attempt to use or sell the goods. Nor will the applicant obtain a windfall by retaining the documents and using them to obtain the goods. If courts adopt the normal measure

of damages in breach of contract cases, the applicant can recover only damages resulting directly from the issuer's breach of the application agreement, not those that it did not suffer or could have avoided. *See* Dolan I, *supra*, § 2.09[7], at 2-60–2-61. Further, the applicant has incentive to minimize its damages, because otherwise it will be required to go through a lengthy litigation with the bank to recover its reimbursement. If it can avoid any damages, no such legal expenses will arise.

Citibank cites one commentator and one case which argue that an applicant has a duty to inspect and return discrepant documents promptly. *See Petra Int'l Banking Corp. v. First Amer. Bank of Va.*, 758 F.Supp. 1120 (E.D.Va.1991), *aff'd*, 953 F.2d 1383 (4th Cir.1992); Henry Harfield, *Bank Credits and Acceptances* 107–08 (5th ed.1974). Harfield argues that the letter of credit transaction "involves a transaction in documents and not in goods," that the customer specifies which documents will be presented, and that "the task of [examining documents] is one of recognition rather than analysis." He concludes, therefore, that "[i]f then the customer accepts, or fails to seasonably reject, the documents, it is manifestly inequitable to permit him, at a later date, to repudiate his own acts to the detriment of the bank." *Id.* at 107. However, Harfield gives no authority for an applicant's duty to inspect the documents; nor does he address the factors considered above, *see supra*, at 44–47. Moreover, simply because a letter of credit transaction is a documentary transaction does not compel an automatic waiver rule. Therefore, I respectfully reject Harfield's position.

The *Petra* Court relied heavily on Harfield. In addition, that Court concluded that a rule requiring prompt notice and return of documents by the applicant to the issuer "provide[s] some compensation to a bank which has inadvertently honored nonconforming documents," *id.* at 1134. The Court reasoned that the issuer could use the documents to mitigate its losses by retrieving the goods, and that if the applicant kept the documents, it could avoid payment because of the nonconformity and keep the goods, there-

by receiving a windfall. As noted above, this reasoning ignores that the issuer usually will already have security at the time it issues the letter of credit, that the applicant is in a better position to mitigate damages, and that no windfall will result if the applicant can recover only losses directly resulting from the issuer's breach. Moreover, although the *Petra* Court established a *per se* rule requiring prompt notification and return of the documents, it did not need to do so. The Court could have decided the case on narrower grounds, because the claimed discrepancy in the documents was a technical defect, raised as an afterthought one year after the applicant received them, *i.e.*, the beneficiary had failed to submit a certificate attesting to the compliance of the goods and the applicant already had waived expressly the absence of a third party inspection certificate as required by the letter of credit. *Id.* at 1123–24. In addition, in *Petra*, the applicant had actually used the documents to receive the goods, and had negotiated a settlement with the beneficiary over the goods' nonconformance. That case is distinguishable because here, the discrepancies are not trivial, plaintiffs did not wait one year after receiving the goods to object, and they never received the goods. Therefore, I respectfully decline to follow *Petra*.

An automatic waiver rule was not in the Application Agreement, and was not required by the U.C.P., contract principles, or controlling case law. Further, such a rule serves little purpose in a letter of credit transaction. Accordingly, because plaintiffs had no duty to inspect the documents, object to discrepancies and return the documents to the issuer, and because plaintiffs took no other acts from which it can be inferred that they intended to relinquish their right to object to discrepancies in the documents, the discrepancies were not waived by operation of law.

The same analysis applies as well if defendants' argument is viewed through the prism of estoppel, which requires proof that a party "relied to its detriment on a misleading representation" of the other party. *United Commodities–Greece*, 489 N.Y.S.2d at 34, 478 N.E.2d at 175. Here, defendants have not alleged that plaintiffs made any misleading

representation to defendants upon which defendants relied, and if plaintiffs had no duty to object, then no estoppel can be inferred from their failure to do so.

### C. *Illegality of the Underlying Contract*

■ Citibank argues that plaintiffs knew that the transaction underlying the letter of credit—plaintiffs' contract with Jade to purchase Levi jeans—involved purchases of counterfeit, or at least "gray market" jeans, either of which Citibank claims is an illegal transaction, and that the illegality of the underlying contract prevents plaintiffs from recovering. Plaintiffs claim that under what is called the "independence principle," the jeans transaction is separate from the letter of credit relationship between the issuer and beneficiary, and therefore any illegality in the jeans transaction would not excuse the issuer's breach, and does not bar the applicant from suing over that breach. However, even if an issuer generally could not assert illegality of the underlying contract as a defense against an applicant's suit for wrongful honor, *cf. Southwestern Shipping Corp. v. National City Bank,* 6 N.Y.2d 454, 460, 190 N.Y.S.2d 352, 356, 160 N.E.2d 836 (1959), *cert. denied,* 361 U.S. 895, 80 S.Ct. 198, 4 L.Ed.2d 151 (1959) ("A mere agent or depository of the proceeds of an illegal transaction will not be permitted to assert the defense of illegality in an action to recover the proceeds by a party to the illegal transaction."), here, the Application Agreement contained a specific provision requiring that the applicant comply with the law in the jeans transaction.[8] The "independence principle" therefore cannot bar Citibank from claiming that plaintiffs breached the Application Agreement and that that breach absolved Citibank from liability for its own breach.

■ Nevertheless, Citibank's argument fails. First, Citibank has presented no evidence from which it can be inferred that plaintiffs knew Jade intended to sell counterfeit jeans. Indeed, the evidence is compelling that plaintiffs were unaware that Jade

intended to ship counterfeit jeans. (Sharrow 7/10/96 Decl., Exs. 24, 38–41, 44; M.J.F.M. Kools 9/9/96 Decl. ¶¶ 9–10; Oei 9/9/96 Aff. ¶ 23; W.M.J.H. Kools 9/9/96 Decl. ¶ 11, Ex. A) The only evidence Citibank presents is Oei's settlement with Levi Strauss in an unrelated action for trademark infringement. However, that settlement does not prove Oei's awareness that the jeans in the present transaction were counterfeit. Further, Oei made no admissions in the settlement documents conceding his involvement in counterfeit jeans trafficking. (Sharrow 7/10/96 Decl., Ex. 6) Nor would these admissions or the settlement agreement itself be admissible to prove such knowledge. *See* Fed.R.Evid. 408.

There is some evidence that plaintiffs knew that this was a gray market transaction (Sharrow 7/10/96 Decl., Ex. 5 at 104–05; *Id.,* Exs. 16, 18; Oei 9/9/96 Aff. ¶ 4), *i.e.,* a transaction where genuine goods are sold outside the manufacturer's distribution network. *See Levi Strauss & Co. v. Gambill,* No. CIV–93–1624, Memorandum of Decision and Order, slip op. at 1 (D.Ariz. Oct. 12, 1993). However, a purchase of goods outside the manufacturer's distribution network does not violate federal trademark or state unfair competition laws because genuine products do not cause consumer confusion. *See Polymer Tech. Corp. v. Mimran,* 975 F.2d 58, 61 (2d Cir.1992) ("As a general rule, trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner."); *see also Sasson Jeans, Inc. v. Sasson Jeans, L.A., Inc.,* 632 F.Supp. 1525, 1528–29 (S.D.N.Y.1986). Here, there is no evidence that plaintiffs attempted to obtain anything other than genuine Levi jeans outside the Levi distribution network. (Oei 9/9/96 Aff. ¶ 4) The transaction, as they understood it, was legal.

### D. *Plaintiffs' Knowledge of the Fraudulent Nature of the Documents*

Citibank argues also that plaintiffs were aware that the documents that Jade would

---

8. The Application Agreement provides, "The Applicant will comply with all foreign and U.S. laws, rules and regulations ... now or hereafter applicable to the transaction related to the Credit

or application to the execution, delivery and performance by the Applicant of this Agreement." (Compl., Ex. A ¶ 13)

submit would be fraudulent in two ways: 1) that they would state that the goods were genuine Levi jeans, even though the jeans were counterfeit; and 2) that they would include "on board"[9] bills of lading consigned to the order of Kools even though plaintiffs were aware that the goods would not be placed on board a ship and consigned to Kools' order until after payment on the letter of credit. Therefore, Citibank argues, plaintiffs should be equitably estopped to assert discrepancies in these documents.

■ This argument too has no basis in demonstrable fact, and therefore provides no basis for a ruling in Citibank's favor. First, as noted above, there is no evidence that plaintiffs were aware that the goods Jade was to ship were counterfeit. If, as seems apparent from plaintiffs' correspondence, plaintiffs were aware that the jeans were being obtained in the gray market, the bills of lading would not have been false. Gray market jeans, according to plaintiffs' understanding, are genuine Levi jeans, and therefore plaintiffs would not have been aware that Jade would submit an invoice and bills of lading that falsely represented the genuineness of the goods.

■ Second, there is no evidence that plaintiffs knew that the bills of lading Jade would submit would be fraudulent in their inclusion of an "on board" stamp. Plaintiffs certainly knew that Jade demanded to be paid before the goods actually were put on a ship bound for Rotterdam, and they appear to have agreed to this term. (Sharrow 7/10/96 Decl., Exs. 17–18) However, it is undisputed that plaintiffs believed that the goods would be given to the shipper before the documents were submitted and the letter of credit paid, i.e., that the shipper would be able to issue genuine bills of lading indicating that it had possession of the goods. (Sharrow 7/10/96 Decl., Exs. 17–18, 30; Sharrow 12/4/96 Aff., Ex. 8) For example, plaintiffs' management consultants, Fryburg & Associates Inc., wrote to plaintiffs on November 25, 1992, "The goods have been released to the shipper, waiting to be put on the boat after

the banks have 'negotiated the L/C,' which means, release of the funds upon presentation of the documents referred to in the L/C." (*Id.*, Ex. 18)

Therefore, the sole issue is whether plaintiffs knew and understood that the bills of lading could not have an "on board" stamp before the goods were actually placed on the ship and were conscious that Jade would have to submit false bills of lading to collect on the letter of credit. There is no evidence that plaintiffs were aware that the "on board" bills of lading required by the letter of credit conflicted with their agreement with Jade, or that the bills of lading which Jade would need to submit to obtain payment on the letter of credit therefore would be false. (W.M.J.H. 9/9/96 Decl. ¶ 26; Oei 9/9/96 Aff. ¶ 21) Plaintiffs had little prior experience with such transactions and Citibank has submitted no evidence from which plaintiffs' understanding of Jade's need to submit false documents can be inferred. In the absence of any evidence of subjective knowledge, plaintiffs will not be equitably estopped to pursue their claim.

### E. *Damages*

■ The final issue is the amount of damages that plaintiffs may recover from Citibank. Although some courts and commentators have held that an applicant is absolved of any responsibility for reimbursing the issuer if the issuer wrongfully honors a letter of credit, *see, e.g., Philadelphia Gear Corp. v. Central Bank,* 717 F.2d 230, 236 (5th Cir. 1983), and others have stated that the applicant can avoid reimbursing the issuer only for the amount of losses resulting from the issuer's wrongful honor, *see, e.g.,* 29 N.Y.Jur.2d, Credit Cards, § 35 (1983) ("[T]he usual rule of damages limiting recovery to direct and proximate consequences will apply."), here the damages would be the same under either rule. As noted above, plaintiffs' losses in the transaction were caused directly by the bank's breach, and because plaintiffs did not receive any goods, plaintiffs are entitled to the full amount they paid to Citibank.

---

**9.** An "on board" bill of lading is a "document evidencing receipt of goods for shipment issued by person engaged in business of transporting or forwarding goods" which "shows that loading has been completed." *Black's Law Dictionary* 152–53 (5th ed. 1979).

## IV.

Both Citibank and Citibank Int'l move also to dismiss the fraud claim. Plaintiffs allege three affirmative misrepresentations or omissions as a basis for their fraud claim. First, plaintiffs claim that three of the documents were altered by Citibank or Citibank Int'l employees. They allege that Castellanos, Citibank Int'l's employee, altered the inspection report by adding the description of the goods and that other Citibank or Citibank Int'l employees added the word "JEANS" to the original packing list and invoice submitted with Jade's third presentment. Second, plaintiffs allege that Citibank and Citibank Int'l failed to disclose to them that Jade had made two prior presentments, which presentments should have demonstrated to defendants that the documents were forged or fraudulent. Third, they allege that Citibank's statement in the payment advice that all documents were "in due form and regular in every respect" was an intentional misrepresentation.

■ Defendants argue that plaintiffs' first claim of fraud—defendants' alteration of Jade's documents—fails to comply with Fed. R.Civ.P. 9(b) requiring that fraud allegations be stated with particularity. Pleadings of fraud must specify the time, place, speaker and the content of the alleged misrepresentations. *See Luce v. Edelstein,* 802 F.2d 49, 54 (2d Cir.1986). "Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987). In normal circumstances, fraud may not be alleged on information and belief; this rule does not apply, however, as to facts "peculiarly within the opposing party's knowledge, in which event the allegations must be accompanied by a statement of the facts upon which the belief is based." *DiVittorio,* 822 F.2d at 1247. These specificity requirements serve two purposes: they assure the defendant fair notice of the claim and the grounds upon which it rests, and protect against harm to reputation from baseless fraud claims. *See Ross v. A.H. Robins Co.,* 607 F.2d 545, 557 (2d Cir.1979), *cert.*

*denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980). Rule 9(b), however, must be read in conjunction with Rule 8(a), which requires that plaintiff plead only a short, plain statement of the grounds upon which he is entitled to relief. *See O'Brien v. National Property Analysts Partners,* 719 F.Supp. 222, 225 (S.D.N.Y.1989).

■ Here, plaintiffs' allegation that Castellanos altered the inspection report meets squarely the requirements of Rule 9(b). (Compl. ¶ 36) It alleges the time, place and content of the alleged misrepresentation, and provides the source for plaintiffs' allegation. On the other hand, plaintiffs do not allege any source for their allegation on information and belief that defendants added the word "JEANS" to the invoice, or any facts to support that conclusion, and that allegation therefore must be stricken.

■ Plaintiffs' allegation that Citibank or Citibank Int'l added the word "JEANS" to the packing list is specific as to the content of the misrepresentation, although it does not state the time or place, or the person who actually altered the document. (Compl. ¶ 37) In addition, this allegation too is based on information and belief. Plaintiffs argue that the details of who within defendants' employ altered the document are peculiarly within defendants' knowledge. Plaintiffs have presented evidence that the packing list Jade submitted originally to Citibank Int'l did not contain the word "JEANS," but that the packing list that Citibank Int'l submitted to Citibank did. (W. Kools 9/9/96 Decl. ¶ 34, Exs. F, G) In light of this evidence, plaintiffs' allegation need not be dismissed under Rule 9(b): plaintiffs have asserted the source for their belief; the information regarding the alteration is peculiarly within defendants' knowledge; plaintiffs have alleged the content of the alteration; there is a narrow window of time and place within which the document could have been altered; and the failure to allege the particular employee responsible does not prejudice defendants.

■ Defendants argue also that they should be granted summary judgment dismissing the alteration allegations. Citibank is entitled to summary judgment because

there is no evidence that its employees altered documents. Plaintiffs claim that Citibank Int'l's acts and knowledge should be imputed to Citibank because: 1) Castellanos was employed by Citibank; and 2) Citibank and Citibank Int'l's are related. However, there is no dispute that in 1992, Castellanos was employed by Citibank Int'l and Citibank Int'l was a wholly-owned subsidiary of Citibank. (Castellanos 10/21/96 Aff. ¶3; Pelly Aff. ¶1) Plaintiffs have presented no evidence demonstrating that I should pierce the corporate veil and that knowledge of the subsidiary should be imputed to the parent corporation.

■ However, plaintiffs have presented evidence sufficient to create an issue of fact as to whether Citibank Int'l's employees altered the documents. With regard to the alteration of the inspection report, Plaintiffs have offered Hart's statement during her deposition in Kools' action against Jade in which she stated that Castellanos added the product description to the inspection report which read, "Levi JEANS 501 0191 NEW ORLEANS, MADE IN USA LABELS." (Sharrow 7/10/96 Aff., Ex. 10) She stated, "I'm sure that was put on at the bank because there was a problem with that, and I think [Luis Castellanos] said he would go ahead and help and do that." (*Id.*) Although plaintiffs have submitted also two documents which Citibank has produced which seem to show that Citibank Int'l received two different versions of the fax from Jade on December 2, 1992—one with the correct product description and one with the "NEW ORLEANS" description—this does not refute completely Hart's statement, especially because the inspection certificate actually sent to Citibank from Citibank Int'l contained the "NEW ORLEANS" description. (Regal 1/22/97 Decl. ¶¶ 5–6 & Exs. A & B) In addition, Hart's later depositions do not contradict specifically this original statement regarding the inspection report, although they may suggest a confused memory. (Sharrow 7/10/96 Decl., Ex. 10 at 122–23; Sharrow 12/4/96 Decl., Ex. 17 at 50) With regard to the addition of the word "JEANS" on the packing list, as noted above, plaintiffs have submitted evidence sufficient for a reasonable fact-finder to infer that Citibank Int'l

altered the document. Although Hart stated during a deposition that she believed someone other than an employee at the bank added the word "JEANS" to the packing list, that statement does no more than create an issue of fact. (Sharrow 12/4/96 Decl., Ex. 17 at 66) Thus, the alteration allegation must be dismissed against Citibank but stands against Citibank Int'l.

■ Plaintiffs' second fraud allegation—defendants' failure to disclose prior presentments—must be dismissed because defendants had no duty to disclose the prior presentments to plaintiffs. There can be no fraudulent failure to disclose absent a duty to disclose. *See Zackiva Communications Corp. v. Horowitz*, 826 F.Supp. 86, 89 (S.D.N.Y.1993). Several cases have held that an issuer need not disclose the details of final or prior presentments before paying the beneficiary. *See Philadelphia Gear Corp. v. Central Bank*, 717. F.2d 230, 237 (5th Cir. 1983); *Banque De L'Union Haitienne, S.A. v. Manufacturers Hanover Int'l Banking Corp.*, 787 F.Supp. 1416, 1422 (S.D.Fla.1991), *aff'd*, 959 F.2d 971 (1992); *Five Star Parking v. Philadelphia Parking Auth.*, 703 F.Supp. 20, 22–23 (E.D.Pa.1989). Plaintiffs cite no case which imposes such a duty. Probably as a result of this difficulty with their fraud theory, plaintiffs reformulate their fraud claim to allege that even though issuers may have no duty to disclose to plaintiffs discrepancies in prior presentments, Citibank should have been aware from the first two presentments that the documents were fraudulent, and that Citibank then committed fraud by paying Jade in bad faith. (Pl. 9/13/96 Mem. at 46–47) However, as noted below, this allegation fails as well because it duplicates the breach of contract claim.

■ Defendants argue also that the fraud claim must be dismissed because it merely restates the breach of contract claim. It is well settled under New York law that "mere allegations of breach of contract do not give rise to a claim for fraud or fraudulent inducement." *Sudul v. Computer Outsourcing Servs.*, 868 F.Supp. 59, 61–62 (S.D.N.Y.1994) (citations omitted). "A contracting party's 'mere promissory statement'

that he will live up to his contractual obligations cannot be the basis of a fraud claim." *Rolls–Royce Motor Cars, Inc. v. Schudroff,* 929 F.Supp. 117, 123 (S.D.N.Y.1996); *see also McKernin v. Fanny Farmer Candy Shops, Inc.,* 176 A.D.2d 233, 234, 574 N.Y.S.2d 58, 59 (2d Dep't 1991). A fraud claim may survive, however, where "the allegations contained [in the fraud claim] are separate and distinct from those giving rise to the breach of contract claim." *Tuck Indus., Inc. v. Reichhold Chemicals, Inc.,* 151 A.D.2d 565, 566, 542 N.Y.S.2d 701, 701 (2d Dep't 1989); *Smehlik v. Athletes and Artists, Inc.,* 861 F.Supp. 1162, 1171 (W.D.N.Y.1994).

Here, only one of the three fraud allegations is distinct from the breach of contract claim. In support of their breach of contract claim, plaintiffs allege that the contract required defendants to refrain from honoring the letter of credit unless Jade submitted conforming documents, and to act in good faith. Plaintiffs claim that Citibank breached the contract by paying on nonconforming documents, and by paying Jade in bad faith despite awareness of Jade's fraud.

The alteration allegation described above, *see supra* at 517–19, is an affirmative misrepresentation that is distinct from defendants' breach of contract claim. However, the other two fraud allegations must be dismissed because they duplicate the breach of contract claim. Plaintiffs' third fraud allegation—that Citibank affirmatively misrepresented that the documents complied with the letter of credit requirements by stating in the payment advice that the documents were "in due form and regular in every respect"—alleges merely that Citibank honored nonconforming documents, and thus restates the breach of contract claim. Although there was no requirement under the Application Agreement that Citibank make an affirmative statement of Jade's compliance, such a statement cannot be separated from the underlying duty to pay on conforming documents only. Similarly, plaintiffs' second fraud allegation—Citibank's payment in bad faith despite knowledge of Jade's fraud—also duplicates the breach of contract claim. The Application Agreement required that defendants act in good faith, and their alleged failure to do so breached a contractual duty. These two fraud allegations are "based solely upon the failure to perform the promise of future acts which constitute the contractual obligations themselves." *Chase v. Columbia Nat'l Corp.,* 832 F.Supp. 654, 660 (S.D.N.Y.1993) (citing *Vanderburgh v. Porter Sheet Metal, Inc.,* 86 A.D.2d 688, 446 N.Y.S.2d 523, 525 (3d Dep't 1982)). Accordingly, only plaintiffs' allegation that Citibank Int'l altered the inspection report and the packing list survives. The other fraud allegations, including those against Citibank, are dismissed.

## V.

Defendants argue also that plaintiffs' aiding and abetting claim should be dismissed. Plaintiffs assert that defendants aided and abetted Jade's fraud, and this claim survives. To maintain a claim for aiding and abetting, plaintiffs must show:

> (1) the existence of a ... violation by the primary (as opposed to the aiding and abetting) party; (2) "knowledge" of this violation on the part of the aider and abettor; and (3) "substantial assistance" by the aider and abettor in the achievement of the primary violation.

*Morin v. Trupin,* 711 F.Supp. 97, 112 (S.D.N.Y.1989). The plaintiff must allege also that the injury was the direct or reasonably foreseeable result of the aiding and abetting conduct. *Id.* Plaintiffs adequately allege the existence of a primary fraud. Jade never provided the jeans and Jade's president pleaded guilty to fraud. In addition, plaintiffs have alleged that defendants knew of the fraud (Compl. ¶ 55), and have provided other allegations that support this claim, including the discrepancies in Jade's documents and the circumstances surrounding the first two presentments which plaintiffs claim should have alerted defendants to the fraud. Plaintiffs also have alleged adequately that Citibank Int'l provided substantial assistance to the fraud. As noted above, plaintiffs have adequately alleged at least two affirmative misrepresentations by Citibank Int'l which constitute substantial assistance to the underlying fraud. However, the claim against Citibank is insufficient because plain-

tiffs have not alleged any substantial assistance by Citibank. Defendants argue that Citibank's payment despite knowledge of the fraud amounts to substantial assistance, but that merely restates the contract claim and cannot form the basis for an independent claim of aiding and abetting fraud. *See, e.g., Lucariello v. Clayton D. Masonry Contracting, Inc.*, 115 A.D.2d 319, 495 N.Y.S.2d 873 (4th Dep't 1985); *G.D. Searle & Co. v. Medicore Communications, Inc.*, 843 F.Supp. 895, 909 (S.D.N.Y.1994) ("In order to sustain a tort action separate from the breach of contract claim, the tortious conduct must have breached a legal duty existing independently of the contractual relations between the parties."). Finally, plaintiffs have alleged sufficiently that Citibank Int'l's aiding and abetting proximately caused them injury. (Compl. ¶ 57) For those reasons, plaintiffs' claim against Citibank for aiding and abetting fraud is dismissed, but its similar claim against Citibank Int'l survives.

## VI.

Plaintiffs' fourth claim is for conversion against Citibank, which moves to dismiss, or in the alternative for summary judgment on statute of limitations grounds. Citibank argues that the claim accrued on December 2, 1992, the date on which Citibank reimbursed itself from Oei's Citibank account, and that the three-year statute of limitation has therefore run.

■ "The tort of conversion is established when one who owns and has a right to possession of personal property proves that the property is in the unauthorized possession of another who has acted to exclude the rights of the owner." *Key Bank of New York v. Grossi*, 227 A.D.2d 841, 642 N.Y.S.2d 403, 405 (3d Dep't 1996). An action for conversion is subject to a three-year statute of limitations, *see* N.Y.C.P.L.R. § 214(3) (McKinney 1990), and "accrual runs from the date the conversion takes place ... and not from discovery or the exercise of diligence to discover," *Vigilant Ins. Co. of Amer. v. Housing Auth. of the City of El Paso, Tex.*, 87 N.Y.2d 36, 44, 637 N.Y.S.2d 342, 347, 660 N.E.2d 1121, 1126 (1995).

■ Here, plaintiffs allege that Citibank converted the funds in Oei's bank account by reimbursing itself from the account even though it had forfeited its right to do so by "making the Payment upon a presentation of documents that did not conform to the terms and conditions of the Letter of Credit." (Compl. ¶¶ 69–70) According to the complaint, Citibank paid itself from Oei's account on December 2, 1992. (Compl. ¶ 39) The claim accrued on that date, plaintiffs filed this case on May 17, 1996, and the conversion claim accordingly is time-barred.

■ Plaintiffs argue, however, that the cause of action did not accrue on December 2, 1992 because Citibank fraudulently concealed its wrongdoing. A defendant may be equitably estopped to assert a statute of limitations defense if the defendant's affirmative wrongdoing and concealment was responsible for the plaintiff's delay in bringing suit. *See General Stencils, Inc. v. Chiappa*, 18 N.Y.2d 125, 128, 272 N.Y.S.2d 337, 340, 219 N.E.2d 169, 171 (1966). Here, however, it is apparent even from the face of the complaint that Citibank's fraudulent concealment, even if assumed, did not delay plaintiffs' filing of this action. Plaintiffs' conversion claim is based upon Citibank's honor of nonconforming documents. Plaintiffs acknowledge that they received those documents on December 2, 1992. (Compl. ¶ 40) Any alleged concealment would not have prevented plaintiffs from recognizing the existence of a conversion claim.

Moreover, the evidence the parties submitted on their summary judgment motions demonstrates that plaintiffs were aware in December, 1992 and January, 1993 of the discrepancies in the documents. (Sharrow 7/10/96 Decl., Exs. 20–29) In fact, plaintiffs informed Citibank Int'l on January 25, 1993 that the documents were fraudulent. (Sharrow 7/10/96 Decl., Ex. 46) Plaintiffs were aware soon after the conversion of the facts on which the conversion claim is based. Their failure to sue was not due to Citibank's concealment. Thus, plaintiffs' conversion claim must be dismissed as time-barred.

## VII.

■ Defendants argue also that Kools lacks standing to bring this action. I previ-

ously determined that Kools, as an undisclosed principal, lacked standing, and defendants claim that Kools may not relitigate that issue under the doctrine of res judicata. Plaintiffs argue that I should vacate that decision because defendants willfully concealed evidence at the time of the previous action that Oei disclosed Kools' identity as Oei's principal to Citibank employee Wade Walker at the time he applied for the letter of credit, and thus that Kools was not an undisclosed principal. I need not address this issue now because plaintiffs state that they "are prepared to effect a direct assignment to Kools of Oei's rights as applicant and proceed with the litigation with Kools as assignee and, if necessary, to request leave to amend the complaint to do so." (Pl. 9/13/96 Mem. at 62) Defendants have not opposed this proposal. Moreover, "[u]nder New York law.... [i]n the absence of clear language expressly prohibiting assignment ... contracts are freely assignable." *Pravin Banker Assoc., Ltd. v. Banco Popular del Peru,* 895 F.Supp. 660, 667–68 (S.D.N.Y.1995); *see S & L Vending Corp. v. 52 Thompkins Ave. Restaurant, Inc.,* 26 A.D.2d 935, 274 N.Y.S.2d 697, 698 (2d Dep't 1966). A New York court upheld an assignment to an applicant of an issuer's rights against a confirming bank for the purpose of "facilitating a recovery as compensation for an alleged wrong." *Bellarno Int'l Ltd. v. Irving Trust Co.,* 165 A.D.2d 809, 809, 560 N.Y.S.2d 287, 288 (1st Dep't 1990). The Application Agreement does not prohibit assignment; in fact, it states, "This Agreement shall be binding upon the Applicant, its successors and assigns...." (Compl., Ex. A ¶ 16) Therefore, Oei may assign his rights under the Application Agreement to Kools, which may file an amended complaint as assignee. Once this is accomplished, Kools will have standing to sue under the Application Agreement.

## VIII.

Defendants move to preclude an award of consequential or punitive damages. I need not decide now whether consequential damages are permitted under a wrongful honor claim because plaintiffs have not presented any evidence that they sustained such damages. Therefore, their request for consequential damages must be stricken.

■ Punitive damages are not typically recoverable in a breach of contract action. *Rocanova v. Equitable Life Assurance Society,* 83 N.Y.2d 603, 613, 612 N.Y.S.2d 339, 342, 634 N.E.2d 940, 943 (1994). However, "where the breach of contract also involved a fraud evincing a high degree of moral turpitude and demonstrating such wanton dishonesty as to imply a criminal indifference to civil obligations, punitive damages are recoverable if the conduct was aimed at the public generally." *Id.* (citations and quotations omitted). Here, plaintiffs have failed to allege any conduct aimed at the public generally which would justify such an award. Therefore, the demand for punitive damages in connection with the wrongful honor claim is stricken.

■ Punitive damages are recoverable in a fraud action "where the defendant's fraudulent conduct is gross, wanton, or deliberate and demonstrates a high degree of moral culpability." *Coldwell Banker Residential Real Estate Servs., Inc. v. Eustice,* 190 A.D.2d 839, 840, 594 N.Y.S.2d 52, 53 (2d Dep't 1993). A plaintiff need not demonstrate that the acts were aimed at the public generally to obtain punitive damages in a fraud action. *Borkowski v. Borkowski,* 39 N.Y.2d 982, 983, 387 N.Y.S.2d 233, 233, 355 N.E.2d 287, 287 (1976). I cannot say now that plaintiffs could prove no facts that would entitle them to punitive damages on the fraud claim. Therefore, defendants' motion to strike the demand for punitive damages on the fraud claim is denied.

## IX.

■ Finally, defendants move to strike plaintiffs' jury demand, arguing that the Application Agreement contains a waiver of jury trial. The Application Agreement consists of three pages. On the first, the applicant lists information specific to the particular transaction, such as the documentary requirements for the letter of credit. The next two pages are a form, containing 19 paragraphs governing the transaction. Paragraph 19 of the Application Agreement, the paragraph imme-

diately above the signature lines, provides, "The Applicant and the Bank hereby waive all rights to trial by jury in any action, proceeding or counterclaim arising out of or relating to this agreement or any letter of credit issued by the Bank pursuant thereto." (Compl., Ex. A ¶ 19)

"It is elementary that the Seventh Amendment right to a jury is fundamental and that its protection can only be relinquished knowingly and intentionally." *National Equip. Rental, Ltd. v. Hendrix*, 565 F.2d 255, 258 (2d Cir.1977). A presumption exists against the waiver of a jury trial. *Id.* "In addressing jury waiver clauses, courts have consistently examined the following factors: negotiability of the contract terms, disparity in bargaining power between the parties, the business acumen of the party opposing the waiver, and the conspicuousness of the jury waiver provision." *Sullivan v. Ajax Navigation Corp.*, 881 F.Supp. 906, 911 (S.D.N.Y.1995).

Here, the evidence is sufficient to prove that Oei knowingly and intentionally waived his right to a jury. First, there is no indication that the terms of the Application Agreement were not negotiable. Simply because Oei did not negotiate these provisions, and because the form was created by Citibank, does not mean that the waiver or other terms in the application agreement were not negotiable. The Application Agreement was not like a ticket sold to a passenger boarding a cruise ship. *See Sullivan*, 881 F.Supp. at 911. Second, there was little disparity in bargaining power. Oei was Citibank's longtime customer (Walker 10/28/96 Aff., Ex. A), and Citibank had an interest in accommodating him. Moreover, there is evidence that Oei approached another bank as well for a letter of credit. (Sharrow 12/4/96 Aff., Ex. 19) Third, Oei was an experienced businessman. He was a product manager with IBM for many years. Fourth, the jury waiver provision was highly conspicuous. The provision was set off in its own paragraph, right above the signature line. It was not "set deeply and inconspicuously in the contract." *National Equip. Rental, Ltd.*, 565 F.2d at 258; *see also Orix Credit Alliance, Inc. v. Better Built Corp.*, No. 89 Civ. 7333, 1990

WL 96992, at *2 (S.D.N.Y. July 2, 1990); *National Westminster Bank. U.S.A. v. Ross*, 130 B.R. 656, 667 (S.D.N.Y.1991), *aff'd sub. nom., Yaeger v. National Westminster*, 962 F.2d 1 (1992) ("[t]he waiver provision is set off in its own paragraph less than two inches above the signature line and, like the balance of the Guaranty, is printed in small but entirely legible text."). Oei had the Application Agreement for at least several days and had the opportunity to read it. (Walker 10/28/96 Aff., Ex. E) Oei waived his right to a jury trial knowingly and intentionally, and plaintiffs' demand for a jury trial is stricken.

\* \* \*

For the foregoing reasons, defendants' motion to dismiss, or in the alternative for summary judgment, is granted as to the conversion claim and is granted as to Citibank on the fraud and aiding and abetting fraud claims, but denied as to the other claims. Defendants' Rule 9(b) motion is denied. In addition, Citibank's motions to strike plaintiffs' claim for consequential and punitive damages on the wrongful honor claim and the demand for a jury trial are granted, but their motion to strike the demand for punitive damages on the fraud claim, is denied. Plaintiffs' cross motion for summary judgment on the wrongful honor claim is granted.

SO ORDERED.